THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LACEY CLANTON *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 86—1639, 86—1640 cons.

Opinion filed August 2, 1988.

Paul P. Biebel, Jr., and Randolph N. Stone, Public Defenders, of Chicago (Deborah A. White and Ronald P. Alwin, Assistant Public Defenders, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Kim Novi, and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted both defendants on five counts of armed robbery and one count of aggravated battery. Each defendant was sentenced to five years' imprisonment on the aggravated battery count. Lacey Clan-

ton was sentenced to 11 years' and Ernest Monroe to 16 years' imprisonment on each of the armed robbery counts. All sentences were to be served concurrently.

Only the defendant Clanton contends that he was not proved guilty beyond a reasonable doubt.

Floyd Richardson owned a building at 4109 West 5th Avenue in Chicago. He had made the basement into a neighborhood "recreation center" which was furnished with a bar, card table, pool table, stereo and a few chairs. Iron bars were located just outside the basement door. At approximately 11:50 p.m. on September 26, 1985, Yvette Davis went to the recreation center. Floyd Richardson and Dexter Woodard were already in the basement when she arrived. A few minutes later Claudette Banks and James Thomas came in. After midnight Betty Sloan and Penny McCline entered. Banks asked Sloan and McCline to wait a few more minutes while she went home to check her children. Thomas agreed to drive Banks home, and Davis left to go to her home as well. Davis returned about 10 minutes later. She knocked on the front door and Richardson went to admit her. In order to do so, he had to unlock the front door and pull it toward himself. He then had to open the burglar bars located beyond the door by sliding them sideways. After allowing Davis in, he was in the process of sliding the burglar bars shut when two masked men rushed in.

Richardson tried to prevent the two men from entering and warned the others in the room to get down and protect themselves. Two or three shots were fired, one of which hit Penny McCline in the right ankle. The men yelled, "This is a stick-up" and ordered everyone to lie on the floor. Dexter Woodard lay face down on the floor and heard two male voices throughout the occurrence. After being shot, Penny McCline ran to the bathroom and lay down on the floor with Betty Sloan. McCline could hear two male voices saying, "Give me your jewelry, where's the drugs?" One of the men, later identified as the defendant Monroe, entered the bathroom. He was wearing a stocking mask and carried a shotgun. He then ordered the two women out of the bathroom. Sloan lay down outside the bathroom doorway. McCline was pulled out by Monroe, and she lay down next to Sloan. He then searched both women and took Sloan's necklace, watch and purse. He was wearing plastic gloves. McCline told the man that she was in pain, but he told her to shut up. He pulled up her dress to search her and noticed that she had money in her stocking. He ripped the stocking to remove the money.

Davis lay face down near the pool table. One of the men put a small silver-colored handgun against her head and told her he would blow her

brains out if she did not give him all her money. She gave him all that she had, and the man placed the money in a white bag. She testified that she recognized his face because she had seen him "a couple of times" in the neighborhood. Although she did not know him personally, she knew his brother. She identified Monroe as that man. The other man yelled to Monroe that someone was coming and both men went to the door.

At that time, while James Thomas was locking his car, Claudette Banks went ahead of him to the recreation center. Thomas followed, and as he turned the corner to reach the doorway, he was met by a man with a shotgun. The man wore a stocking mask, grey pants, boots and a white hat. Thomas later identified that man as Monroe.

Monroe pushed Thomas down into the recreation center. Thomas saw that everyone, including Claudette Banks, was lying on the floor. Another man with a pistol was searching Claudette Banks. That man took Banks' jewelry and purse. Thomas described the second man as wearing tan clothes and construction boots, although he admitted that he had told the police that the man wore white shoes. Thomas identified the second man as the defendant Clanton. While Thomas lay on the floor, Monroe searched him and took his watch, rings and $191. He heard Clanton walk toward the bathroom. He also heard Monroe ask Claudette Banks about "happy stick water," apparently drugs, and her answer that she had none.

After Monroe took Thomas' property, Thomas heard a voice say, "Everybody freeze." He saw Monroe peek out the door and then put what Thomas thought was a gun down by the door. Monroe pulled off his mask and lay down between Thomas and Richardson. At that point the police entered.

Officers Patton, Nowlin, Kirchner and Finucane responded at 12:34 a.m. to a call that shots had been fired at 4109 West 5th Avenue. Patton walked down the building gangway toward the basement recreation center followed by the other officers. He observed a closed door with open burglar bars around it. As he approached, he heard a clicking sound that he recognized as the act of loading a round of ammunition into a shotgun. He called out to the other officers, "They've got a shotgun." He found cover south of the door, and Nowlin found cover north of the door. Kirchner and Finucane ran around to the rear of the building. While at the rear, neither saw anyone leave.

Patton hid behind the stairwell and called, "Police, come out with your hands up so I can see them." He could see the feet of two men in the doorway. One man went back inside while the other tried to hide under the stairs. Nowlin saw a shotgun fly out the door at that time.

Patton told the man under the stairs to step out. The man stepped out with his hands raised. That man was the defendant Clanton. Nowlin picked up the shotgun outside the door. Kirchner and Finucane joined the other officers and they all entered the basement with guns drawn. Everyone in the basement was lying on the floor. The officers searched the recreation center to be certain that no one was hiding and placed handcuffs on everyone present. While he was being handcuffed, Thomas told Nowlin that the man lying next to him, the defendant Monroe, was one of the robbers. Clanton was returned to the recreation center and the victims then saw his face and clothing. Sloan and Davis identified him as one of the robbers.

Nowlin left the recreation room to search for more evidence. At the door's threshold he found a white knit hat. Just to the right of the outside doorway, about a foot from the stairwell, was a window covered by chicken wire. He found an unbroken necklace "just sitting up on the chicken wire." The necklace was identified by one of the victims, who was not named by Nowlin. Officer Finucane found a white canvas bag under a radiator near the door. The bag contained about $800, jewelry, a loaded automatic handgun, black gloves and two stocking masks. Lying near the bag were pairs of leather and rubber gloves.

Officer Henry Popek of the gang crimes unit went to the recreation room after the robbery. He recovered a cigar box containing 40 hand-rolled marijuana cigarettes and three white paper packets which contained cocaine. He also found, in the possession of Claudette Banks, a bag containing crushed green plant, later identified as marijuana.

Clanton testified that he went to the recreation center to buy cocaine. When he arrived at the recreation center he found the door ajar and pushed it open. A man wearing a mask and gloves and carrying a shotgun told him to come in and lie down. He saw only one person with a gun. While he lay on the floor he was searched and robbed of $35. After two or three minutes he was lifted up and thrown out the door, face down. He denied ever coming out from underneath the stairwell. He lived in Park Forest. He did not drive or walk to the recreation center but came from his aunt's home at 1010 West Arthington. He denied knowing Monroe or any of the other persons in the basement.

Claudette Banks testified in rebuttal that no one entered the recreation center after her and James Thomas. Daniel Richardson testified in rebuttal that he had seen both defendants arrive at and leave the recreation center together about six or eight months before and that he saw them on a neighborhood corner at the same time on a number of occasions, the last time a week or two before the robbery.

■ The State first contends that the argument that the evidence

does not establish Clanton's guilt beyond a reasonable doubt was not raised in the post-trial motion and is therefore waived. We have examined the motion and conclude that the State is incorrect. Even if the point were not in the motion, we would consider it. *People v. King* (1987), 151 Ill. App. 3d 644, 503 N.E.2d 384.

The defendant Clanton points to the fact that only one witness, James Thomas, identified him as one of the robbers. He says that Thomas' identification was suspect because he could not tell the color of the man's clothing and he originally told the police the man wore white shoes and testified that the man wore tan boots. Moreover, at the time the man identified by Thomas as Clanton was in the basement, he had a stocking mask over his face.

■■ We agree that Thomas' testimony, standing alone, might not be sufficient to convict nor would it be made so by the testimony of two other witnesses, Sloan and Davis, who identified Clanton after he was brought back into the basement by the police, because their testimony is subject to the same limitation as Thomas' testimony, the fact that the man was masked at the time of the occurrence. This is not to say that their testimony is entitled to no weight. All three viewed Clanton within minutes of the occurrence, and they obviously saw a man with the same build, of the same height, wearing the same clothing as the man that had just held them up. Under the circumstances, it was not unreasonable for them to assume that he was the same man who had participated in the robbery. Even without the identifications, however, the circumstantial evidence is so overwhelming that no reasonable person could have concluded other than as the jury did.

Two men entered the basement and committed the robbery. The only way out of the basement was the door; the police arrived in the course of the robbery; and no one got by them. The witnesses established that no one entered the basement after the two robbers. The defendant does not offer any explanation for the disappearance of the second robber.

Officer Patton saw two sets of feet come out the door; one went back inside and the other went under the stairs. Patton ordered the man under the stairs to come out, and Clanton came out with his hands up. A gold necklace was found about one foot from the stairwell where Clanton had been hiding. Officer Nowlin testified that one of the victims identified the necklace, without being able to identify which victim.

The defendant saw fit to testify, and he did so in such a way that the trial judge, with charitable understatement, correctly characterized his testimony as "less than candid." Clanton testified that he went to

the recreation center to buy cocaine. He did not know any of the persons who were there. When he walked in he was confronted by a masked man with a shotgun who ordered him to lie down and robbed him of $35. He was "snatched up" by some unknown person and "pushed out" the door, where he fell on his face. Contrary to Officer Patton, he testified that he was not under the stairwell and that no shotgun was thrown out the door. His testimony was at variance with that of Claudette Banks, who said that no one came into the basement after the robbers. The jury quite properly rejected his inherently incredible story, and the evidence against him was overwhelming.

The defendant Clanton next contends that the court improperly denied his motion *in limine* to exclude evidence of his previous conviction of intimidation and that the State improperly cross-examined him.

The State once again asserts that the defendant waived this argument for failure to include it in the post-trial motion. Again we have examined the post-trial motion and conclude that the State is incorrect.

The defendant's precise argument is not clear; but we have determined from his opening and reply briefs that he is contending that the trial court erroneously took the position that it had no discretion in determining what prior felony convictions were admissible and that error occurred when the assistant State's Attorney cross-examined him regarding his "sentence of probation and what actions on [his] part were considered a violation of that probation." The defendant does not argue that the trial court abused its discretion.

As to the first part of the argument, the defendant refers to the last three sentences uttered by the trial court in ruling on the motion *in limine*. The record contains a written motion *in limine* filed by the defendant, but it concerns medical testimony and not proof of convictions. We assume, therefore, that the defendant now refers to an oral motion *in limine*; we are restricted to the record before us. That shows the attorney for Monroe making an oral motion *in limine* to bar the State from going into his background if he took the stand. Colloquy ensued between the court, the assistant State's Attorney and Monroe's counsel. The court then invited counsel for Clanton to speak, who said this:

> "Judge, as I am citing the same case that the State cites, *People v. Montgomery,* it was filled out and it was crimes they considered to be infamous crimes. Nowhere in there does it have the felony charges as to our defendants. We would join in the motion with counsel, ask as to our crimes it not be allowed to be used in that record, sir."

█ The court then read from Cleary on Evidence (E. Cleary & M.

Graham, Handbook of Illinois Evidence, §609.4, at 378) and repeated the factors listed in that text that a court is to consider in passing on the admissibility of a conviction. Clanton's attorney then said that intimidation of a witness was not such a felony that could be used to affect credibility.

A reading of the record, therefore, shows clearly that the court's statement, now seized upon by the defendant, was in response to the assertion by the defendant's attorney that intimidation of a witness under no circumstances could be used. The record also convinces us that the trial court, in its recitation of the factors to be considered before admitting such evidence, was aware that admission was within the court's discretion. See *People v. Spates* (1979), 77 Ill. 2d 193, 395 N.E.2d 563.

■ The second part of the defendant's argument, cross-examination of the defendant concerning his conviction, must also fall. On direct examination the defendant's attorney brought out that he had received "one year supervision [*sic*] for a theft charge," that he had "received a pandering charge [*sic*]," that they were both misdemeanors, that he pleaded guilty to a battery charge, a misdemeanor, and to an intimidation charge, a felony; and that he was on probation from the intimidation conviction at the time of the occurrence.

On cross-examination the assistant State's Attorney brought out that at the time he was on probation he knew that purchasing cocaine was a violation of the law and, perhaps, of his probation. The only objections made by the defendant's attorney were that the question called for the defendant to give a legal conclusion and that the question had been asked and answered.

First, we are not convinced that the cross-examination was improper in view of the defendant's direct testimony. Second, the ground now advanced was not made in the trial court. Third, if there was any error, it was harmless considering all the evidence against the defendant.

■ The last contention made by the defendant Clanton is the only assignment of error made by the defendant Monroe. They argue that reversible error occurred when the State failed to prove that Monroe and Clanton were cousins, as its cross-examination of Clanton suggested.

The assistant State's Attorney first asked the defendant if he had driven to the location with Monroe, and he answered that he had not. In response to another question, he said that he did not know Monroe. A sidebar took place in which Monroe's counsel directed his argument to the questions concerning whether or not Clanton had arrived with

Monroe. He argued that the assistant State's Attorney should be prepared to prove that he had. No objection was made at that time by the attorney for Clanton. The defendant was asked whether he and Monroe were cousins and he said that they were not. He was asked whether he had known Monroe for many years and he said he had not. The judge then interrupted and conducted another sidebar in which he asked the assistant State's Attorney whether she was prepared to perfect the impeachment. She said that she was. She gave the name of someone named "Richardson" as the person who would perfect the impeachment. After some colloquy, Monroe's attorney asked if she had "documentary evidence to show the familial tie" or was she "going on basically hearsay evidence." She answered that she did not have documentary evidence, she did not have any birth certificate nor did she need one. She said that the witness had spoken to Monroe and there was a possibility that that witness had had conversations with the defendants that they were related. The court asked how she was going to perfect the impeachment, and she said that she would do it with a witness that knew both defendants and knew that they were cousins and that they associate with one another. She was not prepared at that point to say what the witness was going to testify to. The attorney for Monroe asked if the testimony was going to be "a man told me this is this man's cousin." The judge said that even if it were not proved up, if it was established that "they are friends or something like that" it would change things. He told the assistant State's Attorney that she could ask if they were related, if they were friends, or if they knew each other. Contrary to the defendants' assertions here, the assistant State's Attorney never said she would prove they were friends.

The defendant then answered again that he was not related to Monroe and that he did not know him. He also said that the night of September 27 was the first time he saw Monroe.

Daniel Richardson testified in rebuttal that he was present in the basement at 4109 West 5th Avenue approximately six to eight months before the occurrence and saw both defendants. They were together. He was introduced to Lacey Clanton by Monroe's brother. The judge sustained an objection to the testimony that the person was Monroe's brother. He was then introduced to Monroe by the same man. He said that Wendell Monroe introduced Clanton as his cousin. That was permitted to stand. Another sidebar occurred. The court then sustained an objection to the testimony that Wendell said, in the presence of Clanton, that Clanton was his cousin. Further colloquy ensued during which the court said that the evidence might show an admission by silence. After further argument by one of Monroe's attorneys, the court sus-

tained the objection. He said that he would let stand the testimony that they came together.

After the examination of Richardson resumed, he testified that the defendants came in the basement together and left together. He then said that he had seen the defendants at the 5th Avenue and Pulaski corner on a number of occasions. He saw them there about one or two weeks before. They were in the same area at the same time.

On cross-examination the attorney for Monroe brought out that the witness had played craps with Monroe at the recreation center that night. He also played craps with Clanton there. He again testified that he saw Monroe and Clanton on the street together.

Even though the evidence created an inference that the parties did in fact know each other, the defendants still argue that they should be granted a new trial simply because the State failed to prove that they were cousins. Contrary to Clanton's suggestion here, the testimony that was admitted was probative to establish that the defendants knew each other, thus showing that Clanton testified falsely when he told the jury that he had never seen Monroe before.

The cases on this point that have been cited by the defendants have no application here. The record establishes that the assistant State's Attorney made good-faith representations before the witness testified and a good-faith attempt to establish a relationship between the defendants. Moreover, we are not convinced that she could not have properly shown the relationship. The record shows that she apparently was prepared to establish that Wendell Monroe told Richardson in the presence of both defendants that Ernest Monroe was his brother and Lacey Clanton was his cousin. But even if we were to conclude that she could not have shown the relationship and the evidence was properly stricken, in the light of all of Richardson's testimony, it is inconceivable that the absence of proof of such insignificance should be raised to the level of reversible error in any case, let alone a case with such overwhelming proof as there is in this case.

For all these reasons, the judgments of the circuit court of Cook County are affirmed.

Judgments affirmed.

HARTMAN, P.J., and BILANDIC, J., concur.